# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| BILLY JACK RUSSELL, | ) |
|---|---|
| Petitioner, | ) |
| v. | ) Case No. CIV 15-218-RAW-KEW |
| JASON BRYANT, Warden, | ) |
| Respondent. | ) |

## OPINION AND ORDER

This matter is before the Court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner is a pro se state prisoner in the custody of the Oklahoma Department of Corrections who currently is incarcerated at James Crabtree Correctional Center in Helena, Oklahoma. He is attacking his conviction in Pittsburg County District Court Case No. CF-2012-175 for Child Abuse by Injury,[1] setting forth the following grounds for relief:

I. The evidence was insufficient to support Petitioner's conviction.

II. Prosecutorial misconduct deprived Petitioner of a fair trial and violated his right to due process.

Respondent concedes that Petitioner has exhausted his state court remedies for the

---

[1] The jury verdict indicated the conviction was enhanced by one former conviction. No mention of the prior conviction, however, was made at the formal sentencing, and the Judgment and Sentence did not address the former conviction. *Russell v. State*, No. F-2013-229, slip op. at 1 n.1 (Okla. Crim. App. Jan. 27, 2014) (unpublished) (Dkt. 13-3).

purpose of federal habeas corpus review.[2] The following records have been submitted to the court for consideration in this matter:

- A. Petitioner's direct appeal brief.

- B. The State's brief in Petitioner's direct appeal.

- C. Summary Opinion affirming Petitioner's Judgment and Sentence. *Russell v. State*, No. F-2013-229 (Okla. Crim. App. Jan. 27, 2014).

- D. Order declining jurisdiction and dismissing Petitioner's post-conviction appeal. *Russell v. State*, No. PC-2015-383 (Okla. Crim. App. Apr. 27, 2015).

- E. Transcripts of preliminary hearing, jury trial, and sentencing.

- F. State court record.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[2] Petitioner voluntarily dismissed his unexhausted habeas claims in Grounds III, IV, and V (Dkt. 12).

**Ground I: Sufficiency of the Evidence**

Petitioner alleges in Ground I that his conviction for chid abuse by injury of three-year-old J.F. was not supported by sufficient evidence. He specifically argues Kelley Good, J.F.'s mother who testified for the State, was a mentally ill, methamphetamine addict with a criminal history. Ms. Good allegedly admitted she was not taking her medications at the time of J.F.'s injury, and she could not remember where she had been or what she had been doing. On direct appeal, the Oklahoma Court of Criminal Appeals (OCCA) found no merit in this claim:

> [W]e find that the evidence, when viewed in a light most favorable to the State, was sufficient for any rational trier of fact to find the essential elements of the offense of child abuse by injury beyond a reasonable doubt. *See Eastlick v. State*, 90 P.3d 556, 559 (Okla. Crim. App. 2004); *Spuehler v. State*, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985). This Court must accept all reasonable inferences and credibility choices that support the jury's verdict. *Johnson v. State*, 93 P.3d 41, 45 (Okla. Crim. App. 2004). In this case, the credibility choices of the jury were reasonable, and this Court finds sufficient evidence to support the jury's verdict.

*Russell v. State*, No. F-2013-229, slip op. at 2 (Okla. Crim. App. Jan. 27, 2014) (Dkt. 13-3).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The Court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

The OCCA applies the principles of *Jackson* when a defendant challenges the sufficiency of the evidence. Both *Easlick*, 90 P.3d at 557-59, and *Spuehler*, 709 P.2d at 203-04, which were cited by the OCCA in Petitioner's direct appeal, rely on *Jackson* as the standard and authority for claims of sufficiency of the evidence. "[W]here a sufficiency challenge was resolved on the merits by the state courts, . . . AEDPA adds an additional degree of deference, and the question becomes whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard."

4

*Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (citations and internal quotation marks omitted), *cert. denied*, 553 U.S. 1079 (2008). This standard is called "deference squared." *Hooks v. Workman*, 689 F.3d 1148, 1166 (10th Cir. 2012 (quoting *Young v. Sirmons*, 486 F.3d 655, 666 n.3 (10th Cir. 2007)).

"Even if a state court resolves a claim in a summary fashion with little or no reasoning, [this court] owe[s] deference to the state court's result." *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003). A state court's summary disposition must be upheld unless a federal habeas court is persuaded, after conducting an independent review of the record and pertinent federal law, that the state court's result "unreasonably applies clearly established federal law." *Id.* (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's conviction, the Court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). The elements in this case are:

<u>First</u>, a person willfully, maliciously engaged in;
<u>Second</u>, injuring;
<u>Third</u>, of a child under the age of eighteen.

OUJI-CR 4-35 (Dkt. 14-5 at 114); Okla. Stat. tit. or 21, § 843.5.

The record shows that Kelley Good testified she and her three-year-old son, J.F., lived with Petitioner for about six to eight months. On April 30, 2012, she had been ill and in bed for three days, but was up and around. She, Petitioner, and J.F. went to get pizza, and while

5

waiting for the order, they went to the home of Petitioner's friend, Chad Sinclair. After picking up the pizza, Ms. Good, J.F., and Petitioner returned to Petitioner's house. Petitioner left, and Ms. Good and J.F. ate the pizza. Petitioner then returned, and he and Ms. Good began getting J.F. ready for bed. (Tr. 91-93).

J.F. sat on the toilet and vomited on himself. Ms. Good could not find anything to clean him up, so she ran outside and asked Petitioner to help, because she was about to vomit. Petitioner agreed and went inside the house. Ms. Good vomited outside then and walked inside the house. She heard Petitioner yelling, and J.F. was crying. Petitioner was very angry, and she saw him spanking J.F. with a paddle. Petitioner took J.F. off the toilet, spanked him, and put him back on the toilet. These actions repeated for about 45 minutes. Ms. Good testified she was afraid to approach Petitioner, because she did not want to make things worse. Petitioner then went outside, and J.F. came out of the bathroom, shivering and cold. Ms. Good wrapped him in a blanket, put him in her car, and the two left Petitioner's house around midnight. (Tr. 93-96).

Ms. Good drove down the street to the house of two of her friends and asked to use a phone, but they did not have one. She then took J.F. to her trailer. She had a cell phone, but no remaining minutes, and she was unaware she could call 911 even with no minutes on the phone. She was afraid to take J.F. to the hospital, because she thought the authorities would take J.F. away from her. She noticed that J.F.'s bottom was badly bruised before she and J.F. went to sleep. The next morning, Ms. Good went to a neighbor's house to get

6

money for phone minutes and gasoline. The neighbor gave her some money, and she made those purchases. (Tr. 96-98).

Ms. Good called Chad Sinclair and Brittany Fields around 10:00 a.m. and asked to go to their house. Ms. Good and J.F. went to the Sinclair/Fields home where Ms. Good gave J.F. a bath and some Tylenol. J.F. then went to sleep for approximately 45 minutes. Petitioner arrived, and Ms. Good asked Ms. Fields not to let Petitioner in the house, because Ms. Good did not J.F. to see him. Mr. Sinclair went outside and spoke with Petitioner, then Ms. Good also went outside to talk to Petitioner. Ms. Good gave Petitioner the key to his house, and they began arguing about what had happened to J.F. Ms. Fields, Mr. Sinclair, and Petitioner left together. Ms. Good left to take J.F. to her mother's house around 4:00 - 5:00 p.m. (Tr. 98-100).

Ms. Good further testified she initially was afraid to speak with her mother, because her mother probably would call the police when she saw J.F. Ms. Good first went to a store to purchase a drink and some candy, then she and J.F. went to the mother's house. Ms. Good's brother called the police when he learned of the situation. An officer and a worker from the Department of Human Services ("DHS") came to the house, and J.F. was transported to the emergency room of McAlester Regional Health Center. (Tr. 101, 145, 174). Because the severe injuries to J.F.'s buttocks resulted in worsening kidney failure, he was transferred to St. Francis Children's Hospital in Tulsa, where he was treated from May 3 to May 7, 2012. (Tr. 155-58, 162, 165).

7

Ms. Good admitted she did not seek help for J.F. as she should have done. She testified that when she arrived at the Sinclair/Fields house and bathed J.F., Mr. Sinclair and Ms. Fields told her she should be careful about who saw J.F. Ms. Good further stated she called Petitioner's sister while at the Sinclair/Fields house. She denied calling anyone about getting drugs, but admitted she had a drug problem in the past. Ms. Good also admitted she may have smoked methamphetamine on the day J.F. was abused, and she previously had pleaded guilty to the crime of domestic assault and battery in the presence of a minor. She further admitted she was charged with permitting child abuse and neglect and had pleaded guilty to that charge as well. (Tr. 109-19).

Officer Daniel McHenry of the Pittsburg County Sheriff's Department testified he was called to the home of Sharon Ross, Ms. Good's mother, on May 2, 2012, concerning a child abuse case. When he arrived, Ms. Good, Ms. Good's mother, and Lisa Russell, Petitioner's sister, were there. Officer McHenry observed J.F. and his injuries, then contacted DHS and Lindsey House, a DHS worker. Officer McHenry was unable to locate Petitioner at his residence. (Tr. 170-73).

The testimony of Petitioner's friends and defense witnesses, Brittany Fields and Chad Sinclair, differed from that of Ms. Good. Brittany Fields testified that when Ms. Good brought J.F. to the Sinclair/Fields house, she told Ms. Good to call the police or seek medical care for him. Ms. Fields also testified that when J.F. was lying down with Mr. Sinclair, J.F. wanted nothing to do with Ms. Good. Ms. Good was worried about herself, and Ms. Fields

8

heard Ms. Good talking on her cell phone. Ms. Fields thought Ms. Good was trying to arrange a drug purchase. Ms. Fields thought J.F.'s injuries were shocking, but she did not call the police or an ambulance for him. (Tr. 191-97).

Ms. Fields further testified that she had seen Ms. Good, Petitioner, and J.F. together several times. According to Ms. Good, Petitioner was kind and patient with J.F. during his potty training, but Ms. Good yelled at J.F. during this time and spanked him. Ms. Fields admitted Petitioner was her good friend and that she never contacted authorities about Ms. Good's treatment of J.F. (Tr. 197-201, 208).

Chad Sinclair testified he was Petitioner's friend. When Ms. Good came to his and Ms. Fields' house with J.F., he wanted to call the police, but Ms. Good did not want him to contact the authorities. Mr. Sinclair observed that J.F. did not want to have anything to do with Ms. Good. When Mr. Sinclair observed J.F.'s bottom, it was oozing pus, and Ms. Fields and Ms. Good put some salve on it. (Tr. 211-15).

Mr. Sinclair further testified he observed Ms. Good using a phone, and he thought she was attempting to get drugs. When Petitioner came to the house, he was acting normally. Sinclair told Petitioner that Ms. Good said Petitioner had beaten J.F., and Petitioner was shocked. Ms. Good then came outside and spoke with Petitioner, but did not mention J.F. Ms. Good was not arguing with Petitioner. Mr. Sinclair, Ms. Fields, and Petitioner left the Sinclair/Fields house to eat at Sinclair's parents' house, and when Sinclair returned home around 5:00 or 6:00 p.m., Ms. Good was gone. (Tr. 216-20, 230).

9

Mr. Sinclair testified he had known Petitioner, Ms. Good, and J.F. for "some time." According to Sinclair, Petitioner never yelled at J.F. or spanked him when J.F. had an potty-training "accident." Ms. Good, however, became angry and screamed at J.F. and spanked him when he had an accident. Mr. Sinclair testified he previously had told Ms. Good to stop her excessive punishment of J.F., and he regretted not contacting authorities when he saw J.F.'s injuries resulting from the incident in this case. Sinclair stated he believed Petitioner did not commit the charged crime. Sinclair admitted he and Petitioner were good friends, their friendship was stronger than Sinclair's friendship with Ms. Good, and he would do anything to help Petitioner. He testified he took his cell phone away from Ms. Good after she made approximately ten calls in an attempt to obtain drugs. Sinclair also admitted he and Ms. Fields left Ms. Good alone with J.F. when they went with Petitioner to dinner at Mr. Sinclair's parents' house, even though Sinclair believed Ms. Good had injured J.F. (Tr. 220-27, 230).

Mr. Sinclair was shown to have made a prior statement which was inconsistent with his trial testimony. He testified at trial that Ms. Good never mentioned J.F. to Petitioner when she went outside and talked with him. (Tr. 218-19). The prosecutor, however, showed Sinclair's prior statement about the conversation, and Sinclair admitted he previously had stated that Ms. Good told Petitioner that he could not see J.F. (Tr. 229-30).

Petitioner argues that Ms. Good's testimony was not sufficient to support the jury's finding that Petitioner was guilty beyond a reasonable doubt of abusing J.F. He further

10

alleges the testimony of Ms. Fields and Mr. Sinclair served to call Ms. Good's testimony into question. The Court finds the testimony by Fields and Sinclair did not support Good's testimony. Their testimony, however, also showed their friendship with Petitioner possibly affected their failure to take any action in reporting J.F.'s injuries for fear the authorities would arrest Petitioner. In addition the friendship may have influenced them to tailor their testimony to Petitioner's benefit. The jury, however, was free to believe Ms. Good's testimony and not to believe the testimony of Ms. Fields and Mr. Sinclair. *See United States v. Bass*, 661 F.3d 1299, 1307 (10th Cir. 2011) ("[C]redibility determinations are the province of the jury and are 'virtually unreviewable on appeal'") (quoting *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003)). *See also Bland v. State*, 4 P.3d 702, 714 (Okla. Crim. App. 2000) (holding that the jury may believe the evidence of a single witness on an issue and disbelieve that of several others testifying to the contrary).

After careful review of the record, the Court finds the evidence was sufficient under the standard of *Jackson v. Virginia*. The Court, therefore, finds the OCCA's determination that the evidence was sufficient did not constitute an unreasonable application of the *Jackson* standard. *See Diestel*, 506 F.3d at 1267. This ground for habeas relief fails.

**Ground II: Prosecutorial Misconduct**

Petitioner alleges in Ground II of the petition that prosecutorial misconduct deprived him of a fair trial and violated his due process rights. The OCCA found no merit in this claim:

11

> [W]e first note that there were no objections to the comments of the prosecutor, thus we are limited to review for plain error only. *Malone v. State*, 293 P.3d 198, 211 (Okla. Crim. App. 2013). To be entitled to relief under the plain error doctrine, an appellant must prove, first, that actual error occurred, second, which is obvious in the record, and third, the error affected his substantial rights, meaning the error affected the outcome of the proceeding; moreover, this Court will not grant relief unless the error seriously affected the fairness, integrity or public reputation of the judicial proceeding or otherwise represents a "miscarriage of justice." *Hogan v. State*, 139 P.3d 907, 923 (Okla. Crim. App. 2006).
>
> Here, there was no plain error. The argument fell within the liberal freedom of speech allowed when argument is based on competing inferences of the case from opposing points of view, including the credibility of the witnesses, especially when the comments are in direct response to arguments by defense counsel. *Ball v. State*, 173 P.3d 81, 95 (Okla. Crim. App. 2007); *DeRosa v. State*, 89 P.3d 1124, 1149 (Okla. Crim. App. 2004); *Bryson v. State*, 876 P.2d 240, 252 (Okla. Crim. App. 1994); *Hainey v. State*, 740 P.2d 146, 152 (Okla. Crim. App. 1987).

*Russell*, No. F-2013-229, slip op. at 2-3.

> In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the State's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006). Applying these standards, the Court will consider the individual instances of alleged misconduct invoked by Petitioner.

*Allegation of Burden Shifting*

Petitioner alleges the prosecutor shifted the burden of proof with the following statement in his first closing argument:

> "Now you have heard from the Defense in their opening that they would provide evidence that the Defendant did not do this. They didn't provide that evidence." (Tr. 252-53).

It is well settled that while a prosecutor may not comment upon a defendant's exercise of his right to remain silent under the Fifth Amendment, a prosecutor "is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony." *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999). Here, the prosecutor pointed out that only one eyewitness testified--Kelley Good, J.F.'s mother. The two defense witnesses, Ms. Fields and Mr. Sinclair, did not observe how J.F.'s injuries were inflicted. Therefore, the prosecutor's statement clearly was directed at Petitioner's failure to present evidence showing he did not cause J.F.'s injuries, and was not an attempt to shift the burden. *See Trice*, 196 F.3d at 1167; *Roy v. State*, 152 P.3d 217, 231-32 (Okla. Crim. App. 2006) (holding that where prosecutor stating in closing argument that no evidence was presented showing the victim's death was lawful, there was no attempt to shift the burden of proof and thus no prosecutorial misconduct occurred). The Court finds no constitutional error.

*Allegation of Vouching for Kelley Good's Credibility*

Petitioner complains that the prosecutor emphasized in closing that Kelley Good was the only person who witnessed J.F.'s being injured (Tr. 253-55). Petitioner considers this to

be an instance of vouching and of the prosecutor's giving his personal opinion of Petitioner's guilt.

A prosecutor is allowed a "reasonable amount of latitude" in reciting evidence and drawing inferences from evidence. *Duvall v. Reynolds*, 139 F.3d 768, 795 (10th Cir. 1998). "Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witnesses' testimony." *United States v. Magallanez*, 408 F.3d 672, 680 (10th Cir. 1990) (quoting *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990)).

As set forth above, Ms. Good was the only eyewitness to the events resulting in J.F.'s injuries. The Court finds there is nothing in the prosecutor's argument that could be construed by the jury as the prosecutor's indication of a personal belief in Ms. Good's credibility or that the prosecutor personally was assuring her veracity. Instead, the prosecutor's argument was only an inference based upon the presented evidence. This fell within the broad range of argument afforded a prosecutor at trial, and there was no constitutional error.

***Allegation of Calling Chad Sinclair and Brittany Fields Liars***

Petitioner next complains that the prosecutor called the two defense witnesses liars, as evidenced by part of the State's second closing argument:

> You heard from one witness today that changed his story. Do you remember Chad Sinclair? Kelley didn't say anything to him about Billy Jack.³ Then I showed him his own statement that he gave the police. Well, yeah, she did. and you heard Chad. You heard Brittany. Two times, I would do anything to help Billy Jack. Well, we saw them lie. I saw it. You saw it.

(Tr. 266).

These statements were made in second closing, after defense counsel repeatedly impugned Kelley Good's credibility and accused her of lying because of the sentence she received for enabling child abuse (Tr. 257-58), because she had injured J.F. (Tr. 258), and because she tried to buy drugs as her son suffered (Tr. 262). In response, the prosecutor pointed out the inconsistencies between Chad Sinclair's statement to law enforcement and his testimony, as well as the fact that both Mr. Sinclair and Ms. Fields testified Petitioner was their good friend.

Reference to a criminal defendant as a liar is not *per se* prosecutorial misconduct. *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1012 (10th Cir. 1999). It follows that reference to a witness as a liar is even less likely to be prejudicial, especially when the prosecutor comments upon the evidence adduced at trial as supporting the reference. *See Darden*, 477 U.S. at 182 ("Much of the objectionable comment was invited by or responsive to the opening summation of the defense."); *Wimbley v. Werholtz*, 187 F. App'x 840, 844 (10th Cir. June 30, 2006) (unpublished) (holding that "[t]he chance of improper prejudice is

---

³ The Court assumes this is a reference to Chad Sinclair's testimony that when Petitioner arrived at the Sinclair/Fields house, Kelley Good came outside but did not say anything about J.F. to Petitioner (Tr. 218-19).

even less when the alleged liar is a witness other than the defendant," prosecutor's reference to a defense witness as a liar did not constitute prosecutorial misconduct, and prosecutor referenced the evidence presented at trial which showed the witness was lying). It also is proper for the prosecution to respond to the defense's characterization of the State's witnesses' veracity. *Cf. United States v. Anaya,* 727 F.3d 1043, 1056 (10th Cir. Aug. 16, 2013) (where the defense painted the government witnesses as testifying to please the government, the prosecutor properly responded by addressing the truthfulness of the government witnesses); *Andrew v. Moham*, No. CIV-08-832-R, 2015 WL 5254525, at *48 (W.D. Okla. Sept. 9, 2015) (unpublished) (where the prosecutor's arguments were in response to defense arguments, the OCCA's determination that the arguments were proper was in accordance with federal law).

Here, the Court finds there was no prosecutorial misconduct in the prosecutor's comments. Instead, the complained-of comments were merely the State's response to the defense argument that the State's witnesses were lying.

Petitioner further complains that the prosecutor argued that Chad Sinclair cried during his testimony on direct examination, because he was embarrassed by his own testimony (Tr. 267). These comments were in response to the defense argument that Sinclair's tears were an expression of his remorse for not helping J.F. (Tr. 264-65). The Court finds the prosecutor's comment was not improper, as "[p]rosecutors have considerable latitude to respond to an argument made by opposing counsel." *Hernandez-Muniz*, 170 F.3d at 1012.

16

Petitioner also asserts the prosecutor included Ms. Fields in his comment about lying, even though she made no statements inconsistent with her testimony. Ms. Fields' testimony, however, was different in some respects from that of Mr. Sinclair and Ms. Good. For example, Ms. Fields testified that Ms. Good made calls on Ms. Good's cell phone, while Mr. Sinclair testified Ms. Good used his cell phone to make calls. (Tr. 193, 216). In addition, Ms. Fields testified she believed Ms. Good's calls involved the discussion of drugs, while Ms. Good testified she spoke with Petitioner's sister, Lisa Russell, on the cell phone and did not call anyone for drugs. (Tr. 193, 113). Therefore, the Court finds it was appropriate for the prosecutor to infer to the jury that Ms. Fields lied in part of her testimony. *See Wimbley*, 187 F. App'x at 844.

### *Allegation of Omitted Exculpatory Evidence*

Finally, Petitioner claims that Chad Sinclair's statement to the police should have been admitted into evidence at trial. Petitioner, however, fails to explain why he believes the statement should have been admitted, and Respondent asserts the statement was not admissible.

Under the Oklahoma Rules of Evidence, "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon." Okla. Stat. tit.12, § 2613(B). *See also Stiles v. State*, 989 P.2d 955, 958-59 (Okla. Crim. App. 1999). If the witness admits making the prior inconsistent statement, the

17

extrinsic evidence of the prior statement should not be admitted, because the admission by the witness serves the purpose of impeachment. *Kelsey v. State*, 569 P.2d 1028, 1031 (Okla. Crim. App. 1977).

The record shows that Chad Sinclair testified Petitioner came to his house, and Kelley Good came outside and did not mention J.F. to Petitioner. (Tr. 228). The prosecutor gave Mr. Sinclair a copy of his statement where he wrote, "Bill shows up and she [Ms. Good] come [sic] outside. She acts like nothing is wrong. Bill asked where [J.F.] was. She said, in the house. You can't see him." (Tr. 229). The prosecutor asked Mr. Sinclair if Ms. Good actually did talk about J.F. to Petitioner during that conversation, and Mr. Sinclair responded that she did. (Tr. 229-30).

Because Mr. Sinclair admitted he made the prior statement which was inconsistent with his testimony, the actual written statement was not admissible into evidence. Therefore, the prosecutor did not commit prosecutorial misconduct in failing to admit the statement. *See Malone v. State*, 293 P.3d 198, 212 (Okla. Crim. App. 2013) (holding that where there is no actual error in the prosecutor's comments, there can be no plain error).

For the reasons set forth above, the Court finds the OCCA's determination of Petitioner's claims of prosecutorial misconduct was not contrary to, or an unreasonable application of, clearly established Supreme Court law. Thus, Ground II of this petition is meritless.

**Certificate of Appealability**

The Court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, Petitioner is denied a certificate of appealability.

**ACCORDINGLY**, Petitioner's petition for a writ of habeas corpus (Dkt. 1) is DENIED, and Petitioner is DENIED a certificate of appealability.

**IT IS SO ORDERED** this 15th day of August 2018.

_Ronald A. White_
Ronald A. White
United States District Judge
Eastern District of Oklahoma